Will the clerk please call the next case? 1240564 W.C. Adrian Cangas, Appellant by Kenneth Lubitsky v. Illinois Workers' Compensation Comm'n at All, Pavement Services, Inc., Appalee by Gregory Road. Mr. Lubinsky, you may proceed. Good afternoon. May it please the court, my name is Ken Lubinsky. I'm here on behalf of Adrian Cangas, the appellant. I'm asking today that you reverse the decision of the commission and find that it is against the manifest weight of the evidence on specifically the causal connection between the cervical spine injury and my client's complaints of pain in his shoulder. And I'm asking that because if you look at the evidence, an opposite conclusion is clearly apparent on the issue of the cervical spine injury. And that's because Dr. Levin did not testify to a relationship between the cervical injury and the shoulder complaints. And the only testimony on that issue is the testimony of Dr. Darwish. So I'll address Dr. Levin and then Dr. Darwish's testimony. And then if I have time, I'll move on to some of the other issues that are addressed in the decision. So if we look at Dr. Levin, the commission bases its decision on his opinion. And if you really look at his opinion, what he says is there's no cervical injury because there are no cervical complaints. But this misses the petitioner's position on this case and the position of Dr. Darwish. Levin says the petitioner didn't sustain a cervical injury. There's no aggravation to the cervical spine because there are no complaints in the records. But it's the And Dr. Levin did not address that. And if you look at the records, for example, the shoulder pain is there immediately after the incident. It's in the first note from Palos Hospital. And if we look at the petitioner's initial treatment in this case, which was for what was pain he was experiencing in his shoulder with a shoulder specialist, it didn't resolve his pain. It's only when he finally was seen by a cervical specialist that the true source of the problem was identified. And so it's important that Dr. Levin made no comments at all on this relationship. Then if we look at what Dr. Darwish says, he explains that the cervical injuries manifest themselves as upper extremity pain. He said, you know, specifically that the injury at work caused an exacerbation of stenosis. And he goes on to say that a vast majority of patients with stenosis don't have neck pain, but they have upper extremity pain. This is the only explanation given for the petitioner's pain. There's no tears. It's not a rotator cuff. No one else explained this. There's no contrary evidence. And as I said before, the shoulder specialist wasn't able to resolve the petitioner's pain. And if we look at his testimony about the injuries, you know, he starts experiencing that pain right away, immediately after the accident at his first visit, and that pain does not subside. He was in a good condition of health before, and he sustained injuries and then had this pain. So I'd ask that you find that the commission's decision on the causal connection between the cervical injury and the shoulder pain is against the manifest weight of the evidence. Excuse me for a minute. This accident occurred in October of 2017. Is that not correct? That is correct. And what is the very first medical record that even talks about cervical spine? That was Patel in February of 2018, was it not? Yes, that's correct. He was treating with a shoulder doctor from shortly after the accident, from October 30th up until when he got this second opinion from Dr. Patel, who was the one that then thought that the cervical or that the injuries he was experiencing may be coming from the cervical so that is 100% correct. And I think if you go through all the records, you're not going to find the petitioner saying that he's having pain in his neck. It's nowhere in the records. Actually, his pain is consistently in the same part of his arm, which is what or his shoulder, which is what Darwish says is coming from the neck. And I mean, I've been handling these cases for a long time. This is not an uncommon manifestation of a neck or cervical injury. We have, you know, this is something that is seen in treatment, is seen in petitioners or either the shoulder injury is manifesting itself as the neck or vice versa. Like in our case, the neck injury is manifesting itself as a shoulder. Did that answer your question, Justice Hoffman? Yes, it answered my question. Okay, thank you. Darwish was of the opinion, there's no question, that the need for spinal surgery was causally connected to the work, because it was his belief that the plaintiff complained of shoulder injuries, but they were in fact related to his cervical spine. Levin outright opined, period, that there is no causal connection, there was no aggravation or exacerbation of his prior condition of cervical spinal being. So why does Levin have to negate what Darwish's opinion is? He doesn't, he issued his own opinion and the commission appears to have believed him. Because he only says, he doesn't address the full source of the petitioner's injuries from this accident. He's only saying, there's no cervical complaints in the records, so therefore, no cervical injury. And that's exactly what he says, if you look at... Well, I view his testimony as saying, with a reasonable degree of medical condition of cervical spinal being, there is no aggravation, there is no exacerbation. I mean, that's a pretty flat opinion. And the question is, does the commission have the right to believe it? And they find it, by the way, that his opinion was more persuasive than Darwish's. Why can't they believe it? Because he doesn't negate Darwish's theory? Because we know... It's not only because he doesn't negate, I mean, part of it is because he doesn't really address Darwish's theory, and he doesn't address the source of the petitioner's complaints of pain, which are coming from the cervical spine. He basically... But we do agree with Levin that there are no complaints by the claimant of cervical spine pain. Yes. The other question I have for you, somewhere in your brief, you're talking about applying the chain of events theory, vis-a-vis the injuries to his cervical spine. This man's cervical spine was not a condition of good health. This guy had pre-existing stenosis. He had all sorts of conditions in his cervical spine. How do you apply the chain of events theory? Because they were not symptomatic. He continued to work full duty, no surgical recommendations prior to the date of the accident. But that's not the chain of events theory. Chain of events theory has to be a and then a condition of ill-being. This man did not have a cervical spinal condition of good health before this injury. Well, my position is that it is relevant to this injury because to this case, for the reasons I just stated, is that because he was not, he was working, he was not undergoing treatment. I understand your position and I agree that... Well, Darwish's opinion... Darwish's opinion was that this man had pre-existing cervical stenosis and cervical degenerative changes, all pre-existing this event. That was Darwish's opinion. Right. So, my main argument in this case is that this injury exacerbated those conditions. So, yeah, that is the position that the petitioner is taking, is that the pain is coming from this exacerbation of stenosis, which is what Darwish stated. And from a review of Levin's testimony, he doesn't address that at all. So, this is the only testimony on this issue. I agree with you that he did have these pre-existing conditions. My position on that is what I said, is that it was either asymptomatic or not symptomatic enough to require surgery and work until this accident happened. I want to quickly address the TTD issue. And I'd ask that, sorry, was there a question? No. That you also find that the commission's decision on the TTD was against the manifest weight of the evidence because an conclusion is also clearly apparent in that there was no job offer made to Mr. Kangas. If you follow, I'd ask you that you follow the Land of Lakes case. In that case, the claimant retired by choice because he needed income as opposed to the case where a job was offered, but the petitioner didn't accept it. In this case, we have Dr. Levin releasing the petitioner to full duty. There's no evidence that any sort of accommodation was made to the petitioner, light duty restrictions or something to accommodate the restrictions of any of the petitioners treating doctors in this matter. So the only time that was even suggested was at the trial. So I'd ask that you reverse it on those grounds as well. If there are no further questions, I don't have anything further. Thank you. Clear to be none. Thank you, Mr. Lubensky. Mr. Rode, you may. Good afternoon, Justices. My name is Gregory Rode and I'm appearing on behalf of the Appellee Pavement Systems, Inc. I think the commission did exactly what they were built for in this case, and I think that this decision is not against the manifest weight of the evidence. As Justice Foffman correctly pointed out, Dr. Levin's opinion is accepted over Dr. Darwish, and that's exactly what the commission is built to do. Weigh the evidence and determine which expert's opinion to give the most credence to. That's what they did here, and they did it properly. Dr. Darwish testified he would do surgery with this guy's neck irrespective of symptoms. I think that in and of itself is a little scary. I also think that the evidence clearly shows a condition of ill-being prior to, but no symptoms in the cervical spine afterwards. So I agree with Justice Foffman's intimation that the chains of referral is not the means of establishing causation. So I think that Dr. Levin did directly address the issue. I think he did so with the most information, and as this court is aware, the opinion based on the most accurate and complete information is often and should be given the most weight. That's what the commission did here. I don't see any reason that that could be reversed. It was not against the manifest way to the evidence. As to the temporary total disability, we had a full-duty release. There's no accommodation to full-duty release. He either comes to work or he doesn't, and the evidence clearly shows, Your Honors, that he never presented to the respondent saying, hey, can you accommodate me? And the respondent's evidence at the arbitration was we could have. We had a mechanic that could help him with his job, but he never presented himself. The reason he didn't is because this case is a lot different than Land O'Lakes. That's why I think it can be distinguished. In this case, this guy's getting TTD and he decides to retire. So he collects his Social Security. Land O'Lakes, this guy retired because his TTD wasn't getting paid and he needed money. That's what Land O'Lakes established. That's not the facts in this case. I think Dr. Levin's opinion that he could have returned to work roughly six to eight weeks after the accident actually establishes a cutoff date prior to January 1. I have a little question about this. The commission awarded and cut off TTD benefits effective January the 1st of 2018. If you believe Dr. Levin's testimony that he could have returned to work four to six weeks after, at the very latest, that would have resulted in his ability to return to be at MMI on December the 7th, 2017. The commission said they also relied on the surveillance videos of what this guy was doing, but that surveillance video was taken on January the 9th, 2018. So where in heaven's name did they dig up January 1st? I think they dug up January 1st because I asked, when did you retire and take Social Security? And he said 2018. Well, let me ask a question. Is there a single case that suggests that the collection of Social Security in any way prevents the award of TTD or disability benefits? I think what the cases that have addressed that say, your honor, is that it means that they've withdrawn themselves from the job market. And I think in conjunction with Dr. Levin's opinion that this gentleman had reached maximum medical improvement and in conjunction with the surveillance done eight days later, which clearly shows this gentleman is quite capable and quite active and certainly is not credible with respect to the way he's presenting himself to his doctors at that time. So I think the commission, they kind of meshed that together. I would agree with you if the commission had cut off his TTD on December 7th, 2017, according to Levin's opinion, or on January the 9th pursuant to the video, but they can't start picking things out of the air that relate to nothing. And by the way, he was never released. He was not authorized to return to work without restrictions, I don't believe, until June the 5th of 2018. Well, as far as the knee is concerned, if you want to believe restriction up till then, but if you look at all of the evidence in its totality, I think that it supports Dr. Levin's and I think it supports the commission's decision to choose a date of January 1 to terminate the TTD benefits. And I would just suggest that I could have certainly appealed that issue. Having not done so, I've waived it, but I agree with you. I think that the evidence establishes December 7th as the last date that he was temporarily fully disabled. So, I would suggest to the court that the decision is not against the manifest weight of the evidence, and I would ask that it be affirmed. Any further questions? Mr. Lubinsky, you may reply. Thank you. Just a couple of points on that. I agree, I scoured the records to try and find why the January 1 date was chosen, and I could not make that determination either. As far as the surveillance goes, it's important to note that that was done when Mr. Kangas was still under the care of the shoulder specialist, not the cervical doctor. And if you look at the video, Mr. Kangas testified to the various weights of these items, and it does show him struggling with, you know, moving these various items when he's getting up and down. He does clearly have difficulty doing that in the video. So, I think that's important to note with the video. With the return to work issue with Dr. Levin, it should also be noted, the petitioner was kept being kept off work by his doctors. This was a case that was being litigated. So, these discussions about returns to work and light duty, you know, this is all something that would have been addressed between the attorneys as opposed to, you know, Mr. Kangas or his direct employer when we're talking about these things. And I think that should be kept in mind when there's some suggestion that the employer would have taken him back with restrictions at the time. Dr. Levin, it actually does not make logical sense. So, Dr. Levin returns him to work full duty. He's kept off of work on restrictions. There's no job offer either way at that point in time. So, with that, unless there's any further questions for me, I'll rely on my briefs for the remainder. Any further questions? Nothing for me. Very good. Well, thank you, counsel, both for your arguments in this matter this afternoon. It will be taken under advisement and written disposition shall issue. At this time, the clerk of our court will from our remote courtroom, and we'll proceed to the next case. Thank you. Thank you very much.